**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KYLIE BROWN,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION: 1:21-00355-KD-C** |
| | ) | |
| **YARING'S OF TEXAS, INC.,** | ) | |
| **Defendant.** | ) | |

| | | |
|---|---|---|
| **YARING'S OF TEXAS, INC.,** | ) | |
| **Third-Party Plaintiff/** | ) | |
| **Counter Defendant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION: 1:21-00355-KD-C** |
| | ) | |
| **ATLANTIC SPECIALTY INS. CO.,** | ) | |
| **Third-Party Defendant/** | ) | |
| **Counter Claimant.** | ) | |

**ORDER**

This matter is before the Court on Third-Party Defendant/Counter Claimant Atlantic Specialty Insurance Company (ASIC)'s Motion for Summary Judgment (Docs. 73-75), Third-Party Plaintiff/Counter Defendant Yaring's of Texas, Inc. (Yaring's)'s Response (Docs. 88-89), and ASIC's Reply (Docs. 94, 96) and Motion to Strike (Doc. 95).

1

## I.   **Findings of Fact**[1]

## A.   **The Incident**

During Memorial Day weekend of 2020, the Plaintiffs were vacationing in Orange Beach, Alabama and decided to take a boat ride.  This litigation is the result.  Specifically, the Plaintiffs allege that they were injured while riding on a 30 foot jet boat named the M/V EAGLE II on Saturday May 23, 2020. (Doc. 74-1 at 2-3 (Dep. Capt. Jones at 38-39)).

For the last 20 years Defendant Yaring's of Texas, Inc. d/b/a Hudson's Marina (Yaring's)[2] has owned and operated Hudson Marina in Orange Beach where it charters and leases jet skis, pontoon boats, and other vessels to the public -- including as of 2020, the M/V EAGLE II.  (Doc. 74-1 at 3-4 (Dep. Capt. Jones at 11, 17)). The M/V EAGLE II was issued a Certificate of Inspection (COI) by the U.S. Coast Guard which states: "this vessel may carry 23 Passengers, 0 Other Persons in crew, 0 Persons in addition to crew, and no Others. Total persons allowed: 25."  (Doc. 74-8 at 11-12 (COI); (Doc. 74-1 at  4 (Dep. Capt. Jones at 17); Doc. 74-15 at 5 (Dep. LJones at 27)).

At the time of the incident there were 16 passengers on the M/V EAGLE II plus two (2) crew members (Captain Rodney Jones (Capt. Jones) and deckhand David Knight (Knight)), for a total of 18.  (Doc. 74-1 at 3 (Dep. Capt. Jones at 39)).  As described by Capt. Jones, while aboard the vessel and exiting an area called Perdido Pass, the M/V EAGLE II "topped an unusually high

---

[1] The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[2] Yaring's is a corporation organized under the laws of Texas with its principal place of business in Orange Beach, Alabama.  (Doc. 14 at 2; Doc. 89-1 at 3 (Dep. Capt. Jones at 11)). Captain Rodney Jones (Capt. Jones) is the President of Yaring's and his wife Laurie Jones (L Jones) is the Secretary/Treasurer. (Doc. 89-1 at 3 (Dep. Capt. Jones at 11)).

wave and fell hard into the trough of the wave[]" and "[r]eturned to Port due to one passenger said her back hurt. Assisted two passengers off the Vessel, as a second passenger also said her back hurt[]" -- "[w]as not aware that injury was serious, therefore no emergency response equipment was used." (Doc. 74-2 at 2 (5/24/20 U.S. Coast Guard Serious Marine Incident (SMI) Report)). <u>See</u> <u>also</u> Doc. 74-1 at 3 (Dep. Capt. Jones at 39); Doc. 89-1 at 7, 10, 15 (Dep. Capt. Jones at 44, 58, 167)).  Capt. Jones further elaborated, "I remember ... it was an exceptional reaction that the boat had. So my first thought was turn around and check on my customers." (Doc. 89-1 at 15 (Dep. Capt. Jones at 167)).

Capt. Jones returned to the dock and once docked, another passenger reported that her back hurt; some passengers disembarked and walked to their cars -- at least two (2) individuals were complaining they were hurt. (Doc. 74-1 at 3 (Dep. Capt. Jones at 39) Doc. 89-1 at 15-18 (Dep. Capt. Jones at 167, 190-192); Doc. 74-2 at 2 (5/24/20 U.S. Coast Guard SMI Report)).  Per Captain Jones, "I had no reason to suspect" that anyone needed medical treatment beyond first aid. (Doc. 89-1 at 19 (Dep. Capt. Jones at 198)). Overall nine (9) passengers disembarked but seven (7) passengers continued the boat ride.  (Doc. 74-1 at 3 (Dep. Capt. Jones at 39); Doc. 89-1 at 6 (Dep. Capt. Jones at 40)). At that time Capt. Jones did not know the Plaintiffs were hurt and did not believe that he needed to report the incident to the U.S. Coast Guard "because they walked to their car." (Doc. 89-1 at 10, 19 (Dep. Capt. Jones at 58, 198).

**B.**    **2020-2021 Insurance Policy with Protection/Indemnity (P&I)**

In 2017 Thames Batré Insurance (Thames Batré) -- an entity that places commercial, property and casualty insurance coverage as well as personal lines of insurance -- became Yaring's insurance producer with Taylor Beville as its insurance agent.  (Doc. 74-2 (Dep. Capt. Jones at 36-

37); Doc. 74-8 at 2); Doc. 74-15 at 10 (Dep. LJones at 35); Doc. 94-1 at 2 (Dep. Beville at 10)). In this capacity, Thames Batré obtained access to insurance carrier/insurer ASIC through wholesaler broker Marine N-Surance Brokers (c/o Paul Greenaway (Greenaway)) (Doc. 89-3 at 5-6 (Dep. Beville at 21-22)). ASIC provided marine insurance to Yaring's for the policy years 2018-2019 and 2019-2020. (Doc. 74-16 at 2, 5-6 (Decltn. Lichlyter)).

On April 7, 2020, Laurie Jones (Yaring's) emailed Thames Batré Account Manager Chrissy Catchot (Catchot) with the boat and captain updates, including a passenger vessel scheduled "as of 04-05-19." (Doc. 89-1 at 44-45; Doc. 74-10 at 1-2). The passenger vessel schedule showed the M/V EAGLE II for 12 passengers. (Id.)

| | |
|---|---|
| From: | rodneyjonesprop@aol.com, |
| To: | chrissy@thamesbatre.com, |
| Subject: | Hudson Marina |
| Date: | Tue, Apr 7, 2020 1:12 pm |
| Attachments: | HUDSO-6 Captain Schedule as of 4-5-19.xlsx (12K), Passenger Vessel Schedule as of 04-05-19.xlsx (12K) |

Here are the boat and captain updates
Laurie

| Vessel Name | Year | Hull Material | Length | Gross Registed Tons | # of Crew | # of Servers | # of Passengers | Operations |
|---|---|---|---|---|---|---|---|---|
| American II | 1976 | Fiberglass | 61' | 72 | 5 | | 62 | Fishing / Dolphin Cruise |
| Explorer | 1995 | Fiberglass | 77' | 50 | 6 | | 82 | Fishing / Dolphin Cruise |
| Wishbone | 1993 | Fiberglass | 40' | 22 | 2 | | 18 | Fishing |
| C.A.T. | 1987 | Fiberglass | 40' | 22 | 2 | | 23 | Fishing |
| American Star | 1959 | Wood | 59' | 45 | 3 | | 65 | Pirate Cruise |
| Eagle II | 2018 | Aluminum | 30' | 11 | 2 | | 12 | Cruise |
| Gray Ghost | 1989 | Fiberglass | 40' | 16 | 2 | | 40 | Sealife Cruise |

On May 1, 2020, Catchot emailed Greenaway, notifying him that Yaring's had "added a couple of vessels w/increased crew/server count[]", attaching those, and asking to "get this requoted so we can let them know how the premium will change[;]" the attachment listed the M/V

EAGLE II as having 2 crew members and 12 passengers.  (Doc. 74-7 at 1-2). On May 5, 2020, Greenaway emailed Catchot stating that because there was no e-mail to renew Yaring's account, "coverage lapsed on 11th April 2020."  (Doc. 74-20 at 4).

On May 20, 2020, Greenaway emailed Catchot stating that the underwriters (which are Intact Services USA, LLC f/k/a OneBeacon Services, LLC (subsidiary of Intact Insurance Group USA, LLC including Underwriting Supervisor Mary Lichlyter)) "will need a schedule of the remaining vessels."  (Doc. 74-12 at 8). On May 21, 2020, Catchot emailed Greenaway and attached a revised vessel schedule.  (Id.)  Later that day Catchot emailed Greenaway: "the Insured advis[ed] they are ready to proceed with binding[]" and "I sent the revised vessel schedule this morning." (Id. at 7).  Greenaway then emailed Catchot the quote, which was yet again revised.  (Id. at 5-7).

On Thursday May 21, 2020, the underwriter issued a Revised Renewal Coverage Quotation for Yaring's stating that Greenaway had acted as broker for the prospective insured and "[w]e have relied on all the information in your renewal submission. You represent to us, under the doctrine of Utmost Good Faith (Uberrimae Fidei), that you have disclosed to us all material and relevant facts concerning this risk." (Doc. 74-16 at 163 (5/21/20 Revised Renewal Quote)). The underwriter stated further "[y]ou have our permission to bind[] ... subject to ....[t]here has been no material change in the risk since we quoted[.]"  (Id.)

On Friday May 22, 2020 Thames Batré prepared an insurance proposal summary (which summarizes the details of the policy providing a general description of coverage) for Yaring's and the P&I coverage section included a vessel schedule identifying (in part) the number of crew for each of the listed vessels (including the M/V EAGLE II (2 crew)); the vessel schedule did not list the number of passengers for any vessel.  (Doc. 74-8 at 7); Doc. 89-3 at 11 (Dep. Beville at 56)).

5

The P&I Coverage section states: "Warranted Number of Crew and Servers is not to exceed the designated number for that vessel." (Doc. 74-8 at 13). At 2:30 p.m., Catchot emailed Laurie Jones (Yaring's) about the cost of the premium stating "[t]he majority of the premium is in the P&I coverage[]" and "[I]'m going to advise the underwriter to bind ... and if they need anything signed, we can get it to them next week.... Let me know before 3:00 if that's what you'd like me to do." (Doc. 74-9 at 1). At 2:56 p.m. Catchot emailed Greenaway and cc'd Taylor Beville ((Beville) Thames Batré), regarding the quote for Yaring's stating "[w]e have the order to bind with these changes and these premiums. Let's put this one to bed." (Doc. 74-12 at 5). At 3:13 p.m. Laurie Jones (Yaring's) emailed Catchot stating "Rodney [Jones] said ok so bind us[;]" however, the responsible person at Thames Batré had left for the day at 3:00 p.m. (Doc. 74-9 at 1).

On Saturday May 23, 2020, the incident occurred on the M/V EAGLE II. See *supra*.

On Sunday May 24, 2020, the U.S. Coast Guard called Capt. Jones because one of the passengers reported the incident, and asked him to complete an accident report form. Capt. Rodney completed a USCG incident form. (Doc. 89-1 at 11 (Dep. Capt. Jones at 59)). On this day, Yaring's submitted a U.*S. Coast Guard Serious Marine Incident Report* noting, "[w]e were unaware this was an incident until the Coast Guard called us Sunday afternoon. We called our Drug Consortium at that time to come and do the testing required at once." (Doc. 74-2 at 3 (5/24/20 U.S. Coast Guard SMI Report)). Yaring's also submitted a *Report of Marine Casualty, Commercial Diving Casualty, or OCS-Related Casualty,* stating the M/V EAGLE II had been involved in an injury that requires professional medical treatment. (Doc. 74-16 at 172-173).

On Tuesday May 26, 2020 the following emails were exchanged among Yaring's, Thames

Batré, and Greenaway, regarding the effective date of Yaring's coverage -- including for the M/V

EAGLE II -- and a requested "No Loss" Letter:

- At 9:34 a.m. Greenaway emailed Catchot with the revised quote.  (Doc. 74-12 at 4).

- At 11:45 a.m. Catchot emailed Laurie Jones (Yaring's) a Revised Proposal stating she did not receive the May 22, 2020 email until that morning "but I have requested binding from the carrier. I just sent you some documents via e-signature to sign ... to get them back to me."  (Doc. 74-9 at 1; Doc. 74-11 at 3).

- At 1:39 p.m. Greenaway emailed Catchot: "I will wait for the TRIA to bind so as not to do things twice."  (Doc. 74-12 at 3).

- At 2:09 p.m. Catchot stated "[t]his is the one we want to bind, so please proceed. I have sent the app and the TRIA to the insured to sign and return."  (Id.)

- At 2:15 p.m. Laurie Jones (Yaring's) emailed Catchot stating: "I need it as of 5/22/20. Taylor [Beville (Thames Batré)] said that was not a problem when I told him I missed you by a few minutes."  (Doc. 74-9 at 1; Doc. 74-11 at 3).

- At 2:56 p.m. Greenaway emailed Catchot asking whether all of the vessels were in operation over the weekend. (Doc. 74-12 at 2).

- At 3:19 p.m. Greenaway emailed Catchot "[w]ith a no loss letter Atlantic Specialty will bind from 22nd May 2020. Please send letter."  (Doc. 74-12 at 1).

- At 3:37 p.m. Catchot emailed Greenaway: "I followed up for the signed TRIA and the Insured wants to know if there is any way Atlantic Specialty can backdate to 05/22 with a no loss letter. She sent the bind requested Friday, but it was after we were already gone for the day. It is attached in case you need proof. Taylor [Beville] said there have been no losses and they are not trying to pull a fast one on us, but he told the insured since we had proof they sent it after hours, maybe we could get it done with a no loss letter. Just let me know."  (Doc. 74-12 at 3).

- At 3:49 p.m., Catchot emailed Laurie Jones (Yaring's) and cc'd Beville that "[t]he underwriter has agreed to the 05/22 date with the attached no loss letter signed and returned. They also need the TRIA and application signed and returned."  (Doc. 74-9 at 3; Doc. 74-11 at 3; Doc. 89-3 at 12 (Dep. Beville at 64)). The no loss letter was presented to Yaring's at that time.  (Doc. 89-3 at 12 (Dep. Beville at 64)).

- At 4:00 p.m. Catchot emailed Greenaway that all of Yaring's vessels had been in operation

over the prior weekend except the M/V AMERICAN STAR.  (Doc. 74-12 at 1-2).

"[S]hortly thereafter" the 3:49 p.m. email "or the next morning," Beville had a phone call with

Laurie Jones at Yaring's -- "that phone call would have been, I [Laurie Jones] saw the No Known

Loss Letter from Chrissy [Catchot] and I'm unable to sign it because we've had an incident."  (Doc.

89-3 at 12-13 (Dep. Beville at 64-65)).  Beville states that "I'm assuming I would have discussed

the effective date ... could not be backdated to the 22nd; therefore, we would have to bind on the

26th. And I think there's an e-mail to Laurie saying something similar about the bind date."  (Id.)

One of the statements that Yaring's would need to attest to in the No Loss letter, if it

submitted one, is that it has: "[n]o knowledge of circumstances or events that may create a claim[]"

"[f]rom 03:13 p.m. on 05/22/2020 to 05/26/2020." (Id.)  In other words, per the No Loss letter,

Yaring's was expected to attest that there had been no circumstances or events that <u>may result in a</u>

<u>claim</u> between May 22 and May 26, 2020, in order to backdate the policy to May 22, 2020.

On Wednesday May 27, 2020 at 9:12 a.m., in response to Greenaway's May 26, 2020 email

stating the policy could be bound effective May 22, 2020 with a No Loss letter from Yaring's,

Catchot emailed Greenaway: **"[t]he Insured said to just bind eff. 05/26/2020. We don't need to**

**go back to 05/22.** The signed app and TRIA are attached."  (Doc. 74-12 at 1; Doc. 89-3 at 37).

On Wednesday May 27, 2020, Laurie Jones (Yaring's) signed a National Marine Program

Application to the International Marine Underwriters, and sent it to Thames Batré (Beville), for a

policy with **a "[p]roposed effective date of 5/26/20."** (Doc. 74-12 at 11; Doc. 74-15 at 11 (Dep.

LJones at 59)). Beville had pre-filled the sections of this application and Laurie Jones signed it.

(Doc. 74-15 at 12 (Dep. LJones at 60)). At the time she signed, Laurie Jones (Yaring's) was aware

of the existence of the May 23, 2020 incident: "[y]es. But I wasn't aware of what the start date [of

8

the policy] was going to be."  (Doc. 74-15 at 11 (Dep. LJones at 59)). Laurie Jones did not disclose

the incident directly to ASIC because Beville filled out the application and "I've never

communicated with them [ASIC] ever."  (Id. at 11-12 (Dep. LJones at 59-60)).

Per Yaring's it had not signed the requested "No Loss" letter in order to have the policy

backdated to May 22, 2020, because of the May 23, 2020 incident and Thames Batré knew of the

loss as Laurie Jones told this to Beville.  (Doc. 74-15 at 12 (Dep. LJones at 60-61)).  Capt. Jones

testified that "[w]e told Batré, our agent." (Doc. 74-1 at 14 (Dep. Capt. Jones at 124)).  "We never

claimed no-incident; therefore, did not sign No-Loss letter. And we requested our okay-to-bind

date."  (Doc. 74-1 at 13 (Dep. Capt. Jones at 123)).  By May 24, 2020, Captain Jones knew this

passenger had contacted the U.S. Coast Guard, drug testing had begun, and Yaring's was

completing accident reports, and responding to her request for a refund.  (Id. at 14 (Dep. Capt.

Jones at 124)). "That's why we didn't sign it [the No-Loss Letter]."  (Id.)

A review of the May 27, 2020 application submitted by Yaring's reveals as follows.  First,

Yaring's application requests an insurance policy with an effective date of May 26, 2020.  Second,

Yaring's application states nothing about the number of passengers for the M/V EAGLE II and

makes no reference to the vessel itself, instead generally referencing Yaring's business as including

"boat rental" and "charter boats."  (Doc. 74-12 at 11-17).  Third, on the last page of Yaring's

application, "For All Sections," is a sub-section entitled Loss Record which states as follows:

> **Loss Record:** Whether insurance is in force or not, list all losses incurred during
> the past five years arising from operations covered by this form of policy, including
> date, cause, amount paid or estimated amount, if claim not settled.
>
> If none, state "none."

(Id. at 17 (emphasis in original)).  This section of the application was left blank. (Id.)

Almost two (2) months later, on July 15, 2020, ASIC issued the 2020-2021 P&I policy (#B5JH28080) to Yaring's **with an effective date of May 22, 2020.** (Doc. 74-6 at 2-46 (5/22/20-5/22/21 Commercial Marine Package); Doc. 74-16 at 9-54); Doc. 74-1 at 5 (Dep. Capt. Jones)).

According to ASIC's Rule 30(b)(6) corporate representative Mark Fairchild (Fairchild), the insurance application does not define the term "loss" and the ASIC insurance policy does not define the term "loss." (Doc. 89-5 at 9-10 (Dep. Fairchild at 61-62)). Additionally, neither ASIC or the underwriter ever received or relied on a "no loss" letter from Yaring's. (Doc. 89-5 at 11 (Dep. Fairchild at 66)). Instead, ASIC relied *on the underwriter*, and *it was the underwriter who made the mistake* -- issuing the policy "for the wrong date[]" with an effective date of May 22 instead of May 26, 2020 even though "he didn't receive" a "no loss" letter from Yaring's. (Doc. 89-5 at 11-12 (Dep. Fairchild at 65-66)) As explained by ASIC, the underwriter made a mistake because "[s]he relied on the fact that she was going to receive a no loss letter[]" and "[t]hat was an error on the part of the underwriter." (Id. at 12 (Dep. Fairchild at 66)). Per Fairchild, when Yaring's received the no loss letter "as I understand and read, they refused to sign it, so ...the policy should not have been issued as of the 22nd. It should have been on the 26th because we didn't receive it." (Id.) As summarized by ASIC, "[w]e can't backdate coverage without a no loss letter." (Id. at 11 (Dep. Fairchild at 65)).

Moreover, per ASIC, while the passenger spreadsheet was received, it was not made part of the application for the Yaring's marine insurance policy: "[i]n this case, no." (Doc. 89-5 at 8 (Dep. Fairchild at 60)). Even so, ASIC relied on it in when issuing the policy and calculating the policy premium: "[t]hat was part of the renewal information, yes[.]" (Id. at 8-9 (Dep. Fairchild at 60-61)).

Relevant portions of the policy include:

- *Section I Declarations Commercial Marine Liability Coverages*, *Coverage Part II - Vessel Protection & Indemnity Description of vessel(s)* section, the M/V EAGLE II vessel is listed as a covered 30 foot cruising vessel with two (2) crew members.  (Doc. 74-6 at 3).

- *Section I Declarations Commercial Marine Liability Coverages*, *Coverage Part II - Vessel Protection & Indemnity Vessel Protection & Indemnity Endorsement* section, the M/V EAGLE II is listed with a 12 passenger endorsement.  (Id.)

- ***Endorsement #2* "[a]ttached to and forming part of policy[]"** issued to Yaring's is the **Passenger Warranty** stating it is "[w]arranted by the Assured [Yaring's] that the number of passengers on board the following vessel(s) shall not exceed <u>See Below</u> or the number of passengers permitted by the United States Coast Guard or other governmental authority, whichever is less."  (Doc. 74-6 at 11 (ASIC 000157) (emphasis added)).  **The M/V EAGLE II vessel is listed below with the number of passengers as 12.  (Id.)**

- *Section 1 Coverage Part II Protection and Indemnity Insuring Conditions, Sub-Section II. Coverages,* excludes payment for bodily injuries including for the "Jones Act, Death on the High Seas Act, General Maritime Law... or any similar law or liabilities."  (Doc. 74-6 at 31 (Section II.A.1.)).

- *Coverage Endorsement to Section I Part II- Protection & Indemnity Crew Endorsement (IMU 01120107)* then, in consideration of additional premium, provides coverage to include crew liability coverage such that the exclusion for the "Jones Act, Death on the High Seas Act, General Maritime Law" verbiage is deleted from II.A.1.  (Doc. 74-6 at 33 (ASIC 000179)).

- *Section 1 Coverage Part II Protection and Indemnity Insuring Conditions, Sub-Section III Exclusions* excludes liability for [f]raud, dishonesty ... of the Insured, its agents or others."  (Doc. 74-6 at 32).

- *Section 1 Coverage Part II Protection and Indemnity Insuring Conditions, Sub-Section V Additional Conditions* provides definitions including that "'occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 74-6 at 32 (Sub-Section H.1. (ASIC 000178))).

- *Section I Coverage Part III Insuring Conditions, Sub-Section IV Exclusions* lists "bodily injury" or "personal injury" as an exclusion.  (Doc. 74-6 at 35, Sub-Section IV.A. (ASIC 000181)).

- *Section I Coverage Part III Insuring Conditions, Sub-section V Additional Conditions* defines, in relevant part, "Bodily injury" as bodily injury sustained by a person, "occurrence" as an accident, and "personal injury means injury" including "bodily injury."

(Id. (Sub-Section V.B.1.-3.)).

- **Coverage Section V General Conditions for Coverage Applicable to all Coverage Sections, Paragraph 6, Concealment, Misrepresentation or Fraud states: "the insurance Policy shall be void of as to all interests of the insured if, whether before or after a loss, any insured hereunder has concealed or misrepresented any material fact or circumstances concerning this insurance or the subject thereof, or the interest of the insured herein, or in the case of any fraud or false swearing by any insured hereunder relating thereto." (Doc. 74-6 at 41 (Sub Section 6 (ASIC 000187))).**

- *Coverage Section V General Conditions for Coverage Applicable to all Coverage Sections, Paragraph 14 Cancellation* provides that ASIC "can cancel the policy or any individual coverage section[]" (Doc. 74-6 at 43 (Sub-Section 14.B. ( ASIC 000189)).

Notably, the policy listing the M/V EAGLE II and issued to Yaring's with an effective date of May 22, 2020 had "[a]ttached to and forming part of the policy[]" is *Endorsement #2*, the Passenger Warranty, which limits the M/V EAGLE II to 12 passengers "or the number of passengers permitted by the United States Coast Guard or other governmental authority, whichever is less." (Doc. 74-6 at 11 (ASIC 000157).

On Friday July 31, 2020, Yaring's submitted a claim to ASIC for the May 23, 2020 incident, a *General Liability Notice of Occurrence/Claim* stating:

> Two individuals claim to have been injured while riding on the Eagle II vessel when it encountered a rogue wave apparently caused by boat traffic in Perdido Pass, Orange Beach, AL. Two individuals suffered a broken back. We do not have claimant's names at this time.

(Doc. 74-14 at 3-6; Doc. 74-16 at 7 (Decltn. Lichlyter at ¶¶27); Doc. 89-5 at 13 (Dep. Fairchild at 76)).

Thames Batré agent Beville testified that in August 2020 he called Greenaway asking about the possibility of backdating Yaring's policy -- telling him that Yaring's requested on May 22, 2020 that the policy be bound, however, the request was made 13 minutes after the office closed, and so Yaring's wished to change the effective date of the policy from May 26 to May 22, 2020.

(Doc. 94-1 at 2, 4-5 (Dep. Beville at 10, 84, 89); Doc. 89-3 at 14-15 (Dep. Beville at 84-85)). Beville testified that he reminded Greenaway that Yaring's did not sign the "no loss" letter when Thames Batré asked because of the May 23, 2020 incident so the effective date of the policy was May 26th. (Doc. 89-3 at 14 (Dep. Beville at 84)).  Per Beville, Greenaway said he would talk with the carrier, and a day or two later Greenaway told Beville he was able to get ASIC to backdate the policy to May 22nd.  (Id. at 15 (Dep. Beville at 85)).  Beville testified that "I have no idea what was said between those two [Greenaway and the underwriter]." (Doc. 94-1 at 5 (Dep. Beville at 89)).

On August 20, 2020, the underwriters issued a letter "declin[ing] coverage," in response to Yaring's July 31, 2020 loss notice reporting a claim, due to its "breach of the express passenger warranty contained in the Policy[]" and stating: "the information that you have provided for the booking on the date of loss shows a total of 16 passengers on board... at the time of this incident[]" and "Policy Endorsement #2 ... the assured warrants that the 'number of passengers ...shall not exceed' 12." (Doc. 74-17 at 1-6; Doc. 89-5 at 13 (Dep. Fairchild at 76)).  The underwriters advised the number of passengers "is a violation of an expressed warranty in the policy."  (Doc. 74-17 at 3, 5).

On August 24/25, 2020 Yaring's received the policy for the first time. (Doc. 74-1 at 9 (Dep. Capt. Jones); Doc. 74-15 at 10 (Dep. LJones at 35)).  The policy included, on Page 157, a passenger limitations/warranty.  (Doc. 89-4 at 4 (Dep. LJones at 36)).  This was the first time Yaring's saw a Passenger Warranty that included the M/V EAGLE II. (Doc. 74-1 at 9 (Dep. Capt. Jones); Doc. 74-15 at 10 (Dep. LJones at 35)). The Passenger Warranty was not discussed with Yaring's prior to the issuance of the policy. (Doc. 89-3 at 20-21 (Dep. Beville at 156-157)).  However, per its

agent Beville, Yaring's would not have been given Page 157 of the policy prior to July 15, 2020 because it is a document generated by ASIC.  (Doc. 89-3 at 20 (Dep. Beville at 156)).  There was no document Yaring's signed to agree to a Passenger Warranty.  (Id.)  When L Jones reviewed the policy upon request, L Jones concluded "I had made a mistake[]" about the passengers on the M/V EAGLE II.  (Id.)  (Doc. 74-1 at 9-10 (Dep. Capt. Jones at 95-96) (noting the 12 passenger limit for the vessel in the policy)).

On August 28, 2020, Catchot emailed Greenaway to notify him that Yaring's made a mistake on the passenger schedule by putting 12 passengers instead of 23 for the M/V EAGLE II:

> There was apparently a typo on the vessel/passenger schedule that the Insured previously provided to us.  The correct passenger count for the Eagle II should be 23 in lieu of 12.  I've attached a revised schedule, as well as a copy of the Coast Guard documents.  Taylor has asked that you request the endorsement effective 05/22/20 – date of binding.  This information has also been passed along to the aduster.

(Doc. 89-1 at 46; Doc. 89-5 at 85).  The attachment is called "Vessel-Passenger Schedule - correct Eagle II passenger count to 23 in lieu of 12 prev provided by Insured"  (Id.)  That day Greenaway forwarded, via email, Catchot's email to the underwriter.  (Doc. 89-5 at 84).  On an unknown date (but presumably at or around this time), the underwriter responded "[s]orry ...we are not willing to increase the passenger capacity at this time."  (Id.)

Underwriting Supervisor Lichlyter, with Intact Services USA, LLC f/k/a OneBeacon Services, LLC (subsidiary of Intact Insurance Group USA, LLC), was one of the underwriters for Yaring's 2020-2021 insurance policy in relation to the M/V EAGLE II.  (Doc. 74-16 (Decltn. Lichlyter)).  Lichlyter "considered the risk profile for the insured and its vessels and set the premium[]" and for same, "[t]he number of crew and number of passengers aboard a covered vessel is ... heavily considered ... since both factors substantially impact the risk profile for each vessel

and each vessel's operation. In general, the more crew a vessel requires, the greater the risk that is associated with its operation. Similarly, the more passengers carried by a vessel, the greater likelihood of injury is associated with its operation and thus, the more risk." (Id. at 2-3 at ¶7)).

Concerning losses, the underwriter bound the policy effective May 22, 2020 based on the following:

> Friday). Communications to Intact from the broker and Producing Agent ensured that "there ha[d] been no losses and [the Insured was] not trying to pull a fast one." This representation is attached hereto as Exhibit H.
>
> In good faith and relying upon this "no loss" representation, Policy No.: B5JH28080 was issued and dated effective from May 22, 2020 through May 22, 2021 as requested.   Back dating the insurance policy to May 22, 2020 from a binding date the following week would not have occurred absent a request from the Insured and/or its producing agent.
>
> ***
>
> Contrary to what had been represented to us by the Insured's agent and in the Insured's signed application, there had in fact been an incident, accident, injuries and loss regarding the EAGLE II on May 23, 2020.  That event is now the basis of the above styled litigation between Plaintiffs and the Insured.
>
> Had the Insured and/or Insured's agent truthfully disclosed the accident of May 23, 2020 aboard the EAGLE II on May 26, 2020 or in its signed application provided on May 27, 2020, Intact would not have back dated the 2020-2021 policy to be effective beginning May 22, 2020 (the date before the loss occurred), but instead would have issued the policy with an effective date of May 26, 2020.

(Id. at 6-7 (Decltn. Lichlyter at ¶¶21-22, 25-26).

The underwriters' assessment of risk, to set the premium and provide an insurance quote for a marine insurance policy covering seven (7) vessels (including the M/V EAGLE II) may have

been different if the number of passengers (23 versus 12) were listed for the M/V EAGLE II.  Yet, it is only one (1) vessel in the marine package and so that risk and premium difference may be minimal, as argued by Yaring's.  However, Lichlyter explains the underwriting process in relation to the number of passengers for the M/V EAGLE II and with regard to the presence or not of a loss:

> In setting premiums for vessel protection and indemnity insurance ("P&I") policies, Intact employs a varying premium amount as a base premium for each vessel based upon its particular characteristics and operational purpose/use.  To its base premium, and to account for the additional risk, premium is added for the number of passengers and crew members anticipated for operating the particular vessel.   A total premium is then generated and quoted to the customer and/or its broker.
>
> For the EAGLE II in April/May of 2020, the customer and/or its agent provided the number of crew and the number passengers expected for the vessel to be two (2) crew and twelve (12) passengers.  After consideration of the information then available for the EAGLE II, Intact set a base premium of $1,300.00. In addition to the base premium, at that time each permitted passenger for that vessel was rated at $10 per passenger.  Since the EAGLE II reported operations with twelve (12) passengers, a $120 increase was added to the $1,300.00 base premium to reflect the risk associated with each additional passenger.   Similarly, at that time a premium was rated for each crew member at $1,000.00.  A vessel operating with two (2) crew members created an increase of $2,000.00.   Then, the total premium for providing P&I insurance to the insured for the EAGLE II was quoted to Yaring's of Texas, Inc. at $3,420.00.

***

16

Throughout the underwriting process for Yaring's 2020-2021 policy, there were numerous exchanges between Intact and the Insured's broker/agent. Intact provided quotes and revised quotes for the Insured's review based upon the information received from the Insured's agent/broker for the 2020-2021 policy. For the 2020-2021 underwriting effort for Yaring's, Intact underwriters communicated to, from, and through the broker, Marine-N-Surance and the Insured's producing agent, Thames Batre of Mobile, Alabama. These communications primarily took place in April and May of 2020.

On May 1, 2020, an Excel spreadsheet was received by Intact from Yaring's and its agent that first identified the vessel "EAGLE II" to be insured for P&I insurance proposed for the 2020-2021 policy period. The number of passengers and crew for the vessel EAGLE II was provided in this spreadsheet and identified as twelve (12) passengers. The email containing the spreadsheet and request is attached hereto as Exhibit D. The spreadsheet detailing the number of passengers for the EAGLE II is attached hereto as Exhibit E. At that time and prior to the issuance of the 2020-2021 insurance policy for Yaring's, I had no other or different information about the number of passengers that the insured would be carried aboard the EAGLE II.

Based upon the information provided to Intact, including twelve (12) passengers to be carried during the vessel's operation, vessel insurance premium for EAGLE II was quoted for Yaring's 2020-2021 policy.

Because it was represented to Intact that the EAGLE II would operate with twelve (12) passengers on board, there was a $120.00 passenger premium added to the vessel's base premium rate. This $120.00 addition reflects Intact's then passenger rate of $10.00 per passenger for the total premium.

If it had been represented to Intact that the permitted passengers aboard the vessel "EAGLE II" was in fact greater than twelve (12) and a quote would have been generated, the premium would have increased with each additional passenger since each additional passenger increases the risk. For twenty-three (23) passengers, the passenger portion of the premium would have been $230.00.   For sixteen (16) passengers, the passenger portion of the premium would have been $160.00.

Based upon the representation provided by the Insured and/or its insurance broker/agent regarding the number of passengers that would be permitted aboard the covered vessels, Policy No.: B5JH28080 was ultimately issued with a passenger warranty. Specifically, for the vessel "EAGLE II," twelve (12) passengers are warranted in the 2020-2021 policy pursuant to the information provided by the Insured. See Exhibit D and Exhibit E. The passenger warranty is within the policy to ensure the risk associated with the number of passengers does not exceed what was provided for by the premium.

(Id. at 2-6 (Decltn. Lichlyter at ¶¶8-9, 11-16, 18)).   Additionally, per the underwriters, "[t]he number of passengers to be carried" on the vessel "was a significant factor and material to the amount of risk that was underwritten ...was considered in the overall risk profile, in the decision to underwrite, and in the assessment of premium rates." (Id. at 6 (Decltn. Lichlyter at ¶18)).

Per Beville, the more passengers, the more risk associated with operation, but the amount of the premium does not increase significantly based on each passenger.  (Doc. 89-3 at 18 (Dep. Beville at 111-112)).  Specifically, the premium charge would increase to $10 a person, such that the additional premium to cover 16 passengers would be $40 (4 additional to 12). (Id.; Doc. 89-5 at 21-22 (Dep. Fairchild at 158, 159)). Per ASIC's corporate representative Fairchild, when calculating the premium for the M/V EAGLE II, "[w]e didn't contemplate it as a vessel as a risk with 23 passengers. We looked at it as a risk with 12 passengers."  (Doc. 89-5 at 22 (Dep. Fairchild at 159)).

On September 15, 2020, Lichlyter (underwriter) stated in an email that the vessel needed to be removed from the policy as a covered vessel because it "does not fit our Underwriting guidelines." (Doc. 89-5 at 86).  On September 16, 2020, the underwriters denied Yaring's coverage under ASIC's policy for the personal injury claims related to the May 23, 2020 incident because of: "your breach of the express passenger warranty contained in the Policy released Underwriters from any and all liability." (Doc. 74-17 at 1 (9/16/20 Denial Letter)).  The underwriters also reference a May 28, 2020 notice of claim (a letter from an attorney sent to Yaring's regarding injuries sustained by individuals "in an accident on 05/23/30[]" and requesting an adjuster contact him on which Yaring's wrote "did not receive this letter[]" and a June 12, 2020 notice (a second such letter to Yaring's); but that Yaring's first loss notice to the underwriters occurred on July 31, 2020. (Doc. 74-17 at 1-2).

On September 18, 2020, ASIC issued a Notice of Cancellation to Yaring's which stated that coverage for the M/V EAGLE II will be cancelled as of October 20, 2020, because the vessel "does not fit our Underwriting Guidelines."  (Doc. 89-1 at 43; Doc. 89-3 at 45). The Notice of

Cancellation stated: "You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with the law, that your insurance will cease at and from the hour and date mentioned above." (Id.) On October 20, 2020, ASIC issued General Change Endorsement Number 4 which deleted the M/V EAGLE II from the Policy effective October 20, 2020 -- i.e., the underwriters cancelled coverage for the vessel by endorsement number 4 to the policy. (Doc. 74-18 at 3).

On November 20, 2020, the underwriters issued a letter to Yaring's responding to October 9, 2020 correspondence and stating that reliance on an insurance summary is misplaced, the documents indicate 16 passengers were on board the vessel rather than 12 as specified in the policy, and that while the U.S. Coast Guard's maximum passenger certification is 23 the language of the policy states that the number of passengers may be 12 or that permitted by the U.S. Coast Guard "whichever is less." (Doc. 74-18). Per the underwriters, "[t]he difference between 23 passengers and 12 passengers is significant and material to the amount of risk that would be underwritten by the P&I policy" for the vessel. (Id. at 2). The Underwriters stated further that the backdating of the policy to be effective May 22, 2020 was based on representations by "your agents" that Yaring's had "no losses" and so in good faith, the policy was backdated and issued; yet, there was a loss on May 23, 2020 and so "the coverage relating to the M/V EAGLE II is considered void... due to the 'no loss' misrepresentation to Underwriters at the time the policy was issued." (Id. at 3).

On November 24, 2020, ASIC issued a Revised General Endorsement Number 4 deleting the M/V EAGLE II from the Policy effective May 22, 2020. ASIC admits that it is required under the Policy to send a Notice of Cancellation to Yaring's regarding Revised Endorsement Number 4. (Exhibit E, pp. 143, 144). On December 14, 2020, ASIC issued another Revised Endorsement

Number 4 making the cancellation of the M/V EAGLE II effective on October 20, 2020. ASIC admits that according to this endorsement, which is the final endorsement, the vessel was covered until October 20, 2020, although ASIC says it was a mistake. (Exhibit E, pp. 145-147) (Exhibit C, Exhibit 70).

## C.    **The Litigation**

On August 12, 2021 Plaintiffs (adult mothers -- individually, as well as in their capacity as representatives of their respective named minor children) initiated this personal injury action (negligence/wantonness) against Yaring's for injuries the adults and minor children suffered while riding on the M/V EAGLE II on May 23, 2020.  (Doc. 1).  On September 24, 2021, Yaring's filed its Answer denying Plaintiffs' allegations.  (Doc. 11).  On October 11, 2021, Yaring's filed a Third-Party Complaint against ASIC for breach of contract and bad faith – based on ASIC's denial of coverage under a marine general liability policy for the May 2020 injuries including doing so without a debatable reason.  (Doc. 14 at 4 (as amended)).  As alleged by Yaring's:

> By letter dated September 16, 2020, Atlantic denied Yaring's claim ...
>
> Atlantic denied coverage based on a passenger warranty stating that the number of passengers on the Eagle II would not exceed 12, when in fact, there were 16 passengers on the vessel on the day of the incident. The passenger warranty is not signed by Yaring's.
>
> The number of passengers included on the passenger warranty apparently came from a passenger vessel schedule provided by Yaring's to Thames Batré Insurance on April 5, 2019 for policy year 2019. Yaring's mistakenly listed the number of passengers as 12. Yaring's did not prepare a passenger vessel schedule for 2020 and had not received the policy when the accident occurred. The passenger vessel schedule is not included as part of the 2020 policy. Atlantic also received information from the U.S. Coast Guard showing that Eagle II was rated for more than 16 passengers. Upon information, the premium paid to Atlantic by Yaring's would be the same if 16 passengers were listed on the passenger warranty rather than 12, therefore, the incorrect number of passengers listed on the passenger warranty is not a material misrepresentation to Atlantic.

(Id. at 3).

On November 8, 2021, ASIC filed its Answer denying Yaring's allegations and asserting a Counterclaim for a declaratory judgment -- a declaration that per "the Policy's clear terms, Yaring's breach of the Policy's Passenger Warranty, and Yaring's misrepresentation, ASIC has denied coverage to Yaring's for the Passenger's Suit[]" and that it has no duty to defend or indemnify Yaring's.  (Doc. 17).

On February 3, 2022, ASIC filed an Amended Answer to Yaring's Third Party Complaint and Amended Counterclaim, alleging the following counterclaims seeking a declaratory judgment with regard to the: 1) passenger warranty breach (Count One) ("[b]ased on the Policy's clear terms, Yaring's breach of the Policy's Passenger Warranty, ASIC has denied coverage to Yaring's for the Passenger's Suit and coverage to Yaring's for the Passenger Suit is void[]"); 2) no loss misrepresentation (Count Two) ("[b]ased upon Yaring's "no loss" misrepresentation, ASIC denied coverage for the May 23, 2020 loss and coverage for the Passenger Suit is void[]"); 3) punitive damage exclusion (Count Three) ("[w]hile the Policy with respect to the EAGLE II is void as pled in Count One and Count Two ... Count Three is pled in the alternative[]").  (Doc. 45).  On September 30, 2022, ASIC moved for summary judgment on Yaring's breach of contract and bad faith claims against it.  (Docs. 73-75).

**II.**   **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Rule 56(c) provides as follows:

*(c) Procedures*

> ***(1) Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> ***(2) Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> ***(3) Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.
>
> ***(4) Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The movant must demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence and the inferences from that evidence in the light most favorable to the nonmovant. Jean–Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. Id. Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party

"cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); see also Fed. R. Civ. P. 56 Adv. Cmte. Note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact[]"). If the movant meets its burden, the burden shifts to the nonmoving party to establish -- with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. Celotex, 477 U.S. at 324. A genuine dispute exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. Waddell v. Valley Forge Dental Assoc., 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.    **Motion to Strike**

ASIC moves to strike "certain statements [by Yaring's] in [its] response in opposition to the motion for summary judgment concerning the deposition testimony of Taylor Beville (Thames Batré) regarding Paul Greenaway ([Doc. 88 at 7, 8, 22,]. Per ASIC:

> On page 8, the statement that "ASIC knew of the May 23, 2020 incident when it back dated the policy" (Doc. 88, p. 7 PageID 992-1021) is premised upon information for which Beville has no knowledge, and, by his own admission, assumed. Beville's statement is mere speculation, and hearsay, and are inadmissible.
>
> ***
>
> On page 22 of Yaring's Response, the following statements are similarly due to be stricken: "In August 2020, Greenaway called ASIC to make the Policy effective May 22, 2020 because Laurie requested on that date that the Policy be bound, but was 13 minutes late.
>
> According to Beville, ASIC made the Policy effective on May 22, 2020 because of Greenaway's phone call, after ASIC became aware of the Loss." On the contrary, Beville admitted that he had "no idea" what was said between Greenaway and ASIC, or if anything conversation regarding the backdating of the Policy was had at all. See Ex. A at p. 89.

On page 7 of Yaring's Response (Doc. 88, PageID 992-1021), specifically paragraphs 25 and 26 of the "undisputed material facts" containing statements made by Marine NSurance Broker representative, Paul Greenaway, to Thames Batré agent, Taylor Beville, over the phone constitute inadmissible hearsay pursuant to Fed. R. Evid. 802. Further, paragraph 26 is premised upon information provided by Beville, who had no knowledge, by his own admission, of when the Policy was backdated or when Greenaway or ASIC became aware of the loss. Thus, paragraphs 25 and 26 of Yaring's Response are due to be stricken.

(Doc. 95 at 2, 4-5).

Rule 56(c)(2) of the <u>Federal Rules of Civil Procedure</u> provides: "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2). The Advisory Committee Notes specify:

Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike.* If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Fed.R.Civ.P. 56, *Adv. Comm. Notes*, "Subdivision(c)" (2010 Amendments) (emphasis added). <u>See, e.g.</u>, <u>Campbell v. Shinseki</u>, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("[t]he plain meaning of these provisions show that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily[ ]"). As motions to strike are thus disallowed, the Court construes ASIC's motion as Objections, to be overruled or sustained.

ASIC's Objections are **OVERRULED.** Yaring's arguments are based on reasonable inferences from the evidence submitted or are statements that the Court has not considered.

Moreover, ASIC has not shown that the alleged hearsay cannot be presented in an admissible form at trial.

IV.   **Breach of Contract**

The elements for a breach of contract claim in Alabama are: 1) the existence of a valid binding contract; 2) plaintiff's performance under the contract; 3) defendant's nonperformance; and 4) damages. ASF Global, LLC v. Soft-Tex Intl, Inc., 2022 WL 4474911, *11 (S.D. Ala. Sept. 23, 2022) (citing  Dupree v. PeoplesSouth Bank, 308 So. 3d 484, 490 (Ala. 2020); Shaffer v. Regions Fin. Corp., 29 So. 3d 872, 880 (Ala. 2009)). In the Third-Party Complaint Yaring's alleges that ASIC breached its contract of insurance (the policy) by improperly denying coverage for Plaintiffs' claims "based on a passenger warranty stating that the number of passengers on the [M/V EAGLE] II would not exceed 12 ... when .... there were 16 passengers[;]" however "Yaring's did not prepare a passenger schedule for 2020 … The passenger vessel schedule is not included as part of the 2020 Policy … the premium ...  would be the same if 16 passengers were listed on the passenger warranty rather than 12, therefore, the incorrect number of passengers listed … is not a material misrepresentation." (Doc. 14 at ¶¶ 8-9).

ASIC moves for summary judgment on Yaring's claim against it for breach of contract and bad faith arguing that: 1) coverage was properly denied because Yaring's breached the policy's express Passenger Warranty by carrying more than 12 passengers on the M/V EAGLE II; and 2) that coverage was properly denied because Yaring's concealed the 5/23/20 incident when procuring coverage and applying for the policy, misrepresenting a loss to underwriters.  (Doc. 45 at 2 at ¶8). ASIC argues further per the application of the doctrine of *uberrimae fidei* it does not matter whether Yaring's misrepresentations were intentional.

Yaring's responds that it did not <u>conceal</u> any loss because: 1) the term "loss" in the policy application is ambiguous and it is not defined therein; 2) the application requested insured to write "none" if there were no losses and Thames Batré left it blank so at most it is incomplete; 3) ASIC knew about the May 23, 2020 incident because on May 26, 2020, Laurie Jones told Beville (Thames Batré) about the incident; 4) ASIC requested that Yaring's execute a "no-loss" letter and even though Yaring's did not do so, it still issued policy effective May 22, 2020; and 5) at the relevant time, Capt. Jones was not aware that Plaintiffs' alleged injuries were serious. (Doc. 88 at 19).   Finally, Yaring's argues that *uberrimae fidei* does not apply as the parties' contracted out of the doctrine, and even if it does, "a misrepresentation on an application is grounds for voiding the Policy" but not merely *part* of the Policy and here, ASIC *only* cancelled the policy as to the M/V EAGLE II, keeping the remainder in effect and retaining premiums.   (Doc. 88 at 17).

**A.**   <u>**Effective Date of Policy**</u>

While Yaring's initially inquired about a May 22, 2020 coverage date, its policy application requested an effective date of May 26, 2020, for coverage for the M/V EAGLE II.   ASIC issued the policy with an effective date of May 22, 2020. The improper backdating of the policy has been explained by ASIC as due to the underwriter's error. Specifically, ASIC indicates that the underwriter relied on the belief that there was a no loss letter, yet Yaring's never signed or returned a no loss letter.   There is <u>no specific evidence</u> that ASIC relied on any oral misrepresentation regarding "no loss" by Yaring's or its agents to issue the policy with an effective date of May 22, 2020.   And as for any alleged written misrepresentation, ASIC cites to an email between Catchot and Greenaway in support of its argument that there was a misrepresentation by Yaring's (or Yaring's agents) to Intact (underwriter).   However, the email is between Yaring's insurance agents

27

and simply indicates that Taylor (Beville), another insurance agent, indicated there were no losses to Catchot and Catchot then relayed that information to Greenaway.  There is no cited evidence that this statement of "no loss" was communicated to ASIC or Intact.[3]  Accordingly, ASIC has failed to show as a matter of law that the effective date of the policy is other than May 22, 2020.

**B.   _Uberrimae Fidei_**

As noted _supra_, the parties dispute the applicability of the doctrine of _uberrimae fidei_. While nationally "[i]t is not well settled whether the doctrine ... applies to P&I insurance[,]" in the Eleventh Circuit -- even with "a reluctance to fashion a blanket rule for P&I polices[]" -- "the doctrine of _uberrimae fidei_ has been described as 'a clear rule of maritime law' and 'the controlling federal rule even in the face of contrary state authority[.]'" 4 LAW AND PRAC. OF INS. COVERAGE LITIG. § 53:14 Protection and indemnity policy-Representations and warranties (Jul. 2022 Update) (citing Steelmet, Inc. v. Caribe Towing Corp., 747 F.2d 689, 695-696 (11th Cir. 1984), _on reh'g_, 779 F.2d 1485 (11th Cir. 1986)).[4]  See e.g., Gamez v. Ace Am. Ins. Co., 638 Fed. Appx. 850 (11th Cir. 2016) (applying _uberrimae fidei_ and stating in dictum that even unintentional material misrepresentations results in a policy being voided); AIG Centennial Ins. Co. v. O'Neill, 782 F.3d 1296, 1303 and 1305-1306 (11th Cir. 2015) (_uberrimae fidei_ is controlling law within the Eleventh Circuit and applying the doctrine to a marine insurance dispute to analyze the materiality of errors on a policy application (citing Markel Am. Ins. Co. v. Nordarse, 297 Fed. Appx. 852, 853 (11th

---

3 The Court is aware that Intact Underwriting Supervisor Mary Lichlyter provided an affidavit stating "[c]ommunications to Intact from the broker and Producing Agent ensured that 'there had been no losses and [the Insured] was not trying to pull a fast one.' This representation is attached hereto as Exhibit H."  However, exhibit H is the email between Yaring's agents.  There is no evidence cited that this email was sent to Intact/ASIC or that Greenaway communicated this information to Intact/ASIC.

4 _Cf._ Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 889 (5th Cir. 1991) (rejecting _uberrimae fidei_ as entrenched in federal maritime law).

Cir. 2008) (*per curiam*)); HIH Marine Servs. Inc. v. Fraser, 211 F.3d 1359, 1362 (11th Cir. 2000) (*uberrimae fidei* is "well-settled" as the "controlling law" of the Eleventh Circuit); Great Lakes Ins SE v. SEA 21-21 LLC, 568 F.Supp.3d 1318, 1323 (S.D. Fla. 2021) (same); Northfield Ins. Co. v. Barlow, 983 F. Supp. 1376, 1379 (N.D. Fla. 1997) ("*Uberrima fidei*, requiring parties to a maritime contract to deal in utmost good faith and full disclosure, has been accepted in the Eleventh Circuit as firmly entrenched precedent, controlling even in the face of contrary state authority[]").

In accordance with *uberrimae fidei,* the insured bears a heavy burden when procuring marine insurance because the rigorous consequence of a "material" misrepresentation on an application -- whether by mistake, accident, or forgetfulness -- voids the policy.  As such, "[w]hen applying for P&I insurance, the assured must be careful not to make misrepresentations to the insurer. In the field of marine insurance the insured generally is obligated to deal with the insurer in 'the highest degree of good faith and to fully disclose all facts material to an insurance risk."[1] ...*'"* 4 LAW AND PRAC. OF INS. COVERAGE LITIG. § 53:14 Protection and indemnity policy - Representations and Warranties (Jul. 2022 Update) (footnote omitted). The Eleventh Circuit explained this reasoning -- and that it is an affirmative duty -- in HIH Marine, 211 F.3d at 1362-1363 (emphasis in original):

> ... *Uberrimae fidei* requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk. *See Steelmet,* 747 F.2d at 695; *see also Fireman's Fund Ins. Co. v. Wilburn Boat Co.,* 300 F.2d 631, 646 (5th Cir.1962) (discussing the duty to disclose in marine insurance law); G. Gilmore & C. Black, *The Law of Admiralty* 62 (2d ed. 1975) ("[T]he highest degree of good faith is exacted of those entering [a marine insurance contract], for the underwriter often has no practicable means of checking on either the accuracy or the sufficiency of the facts furnished him by the assured before the risk is accepted and the premium and conditions set."). **The duty to disclose extends to those material facts not directly inquired into by the insurer.** *See Jackson v. Leads Diamond Corp.,* 767 F.Supp. 268, 271 (S.D.Fla.1991); *see also Cigna Property & Cas. Ins., Co. v. Polaris Pictures Corp.,* 159 F.3d 412, 420 (9th Cir.1998)

("Whether or not asked, an applicant for marine insurance is bound to reveal every fact within his knowledge that is material to the risk.").

Under *uberrimae fidei,* a material misrepresentation on an application for marine insurance is grounds for voiding the policy. *See Steelmet,* 747 F.2d at 695 (a misrepresentation, even if it is a result of "mistake, accident, or forgetfulness, is attended with the rigorous consequences that the policy never attaches and is void" (quoting *Wilburn Boat Co.,* 300 F.2d at 646)). A misrepresentation is material if "it might have a bearing on the risk to be assumed by the insurer." *Northfield Ins. Co. v. Barlow,* 983 F.Supp. 1376, 1380 (N.D.Fla.1997); *see also Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.,* 795 F.2d 940, 942–43 (11th Cir.1986) (materiality is "that which could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk").

***

... The central principle of *uberrimae fidei* ... is that the *insured* bears the burden of full and voluntary disclosure of facts material to the decision to insure. This duty to disclose is based on the rationale that requiring the marine insurer to investigate each and every claim made by those applying for coverage "would be both time consuming and expensive." *Northfield Ins. Co.,* 983 F.Supp. at 1383. Instead, the law has placed the burden of good faith disclosure with the person in the best position to know all the facts: the insured. *Id.* ...

This heavy burden also has extensive reach -- encompassing the actions and (mis)representations not only of the insured, but by a person acting *on behalf of* an insured (*i.e.*, insurance agent, broker, etc.). See e.g., Great Lakes Ins. SE v. Sunset Watersports, Inc., 570 F.Supp.3d 1252, 1261-1264 (S.D. Fla. Nov. 8, 2021): "[A]n insurer may void the policy even if the failure to disclose material facts was the result of actions by a person acting on behalf of the actual insured." *Great Lakes Reinsurance (UK) PLC v. Atl. Yacht & Marine Servs., Inc.,...2008 WL 2277509, at *3 (S.D. Fla. Feb. 26, 2008)* (citing *Underwriters at Lloyd's v. Giroire,* 1998 A.M.C. 2153, 27 F.Supp.2d 1306 (S.D. Fla. 1998); *Royal Insurance Co. Of America v. Cathy Daniels, Ltd.*, 684 F. Supp. 786 (S.D.N.Y. 1986))."

The Eleventh Circuit defines "materiality" as that "which could ***possibly influence*** the mind of a prudent and intelligent insurer in determining whether he would accept the risk, and . . .

30

that concealment of such facts voids the policy, whether the concealment be due to fraud, negligence, accident, or mistake." Kilpatrick Marine Piling v. Fireman's Fund Ins. Co., 795 F.2d 940, 942-943, 943 n.2 (11th Cir. 1986) (emphasis added). Courts within the Eleventh Circuit have concluded similarly. See also e.g., Yellow Fin 36 LLC, 736 F. Supp. 2d at 1307 (defining materiality as "that which could **possibly influence** the mind of a prudent and intelligent insurer in determining whether he would accept the risk[]" (emphasis added)); Great Lakes Reinsurance (UK) PLC v. Morales, 760 F. Supp. 2d 1315, 1325 (S.D. Fla. 2010) (quoting HIH Marine., 211 F.3d at 1363) (a material misrepresentation is one that "**might have a bearing** on the risk to be assumed by the insurer[]" (emphasis added). In 2015, materiality was explained as follows:

> To decide whether a fact is material, we inquire whether it could "**possibly influence** the mind of a prudent and intelligent insurer in determining whether he would accept the risk." *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.,* 795 F.2d 940, 942–43 (11th Cir.1986). In this way, we have clarified, materiality is a concept "broadly defined." *Fraser,* 211 F.3d at 1363–64.
>
> An insured who conceals or misrepresents a material fact commits "manifest fraud, which avoids the policy." *McLanahan,* 26 U.S. at 185. That holds true regardless of whether the misrepresentation is "[willful] or accidental, or result[s] from mistake, negligence or voluntary ignorance." *Steelmet,* 747 F.2d at 695 (quotation marks omitted). Commonsense dictates such an approach—"the law has placed the burden of good faith disclosure with the person in the best position to know all the facts: the insured." *Fraser,* 211 F.3d at 1363...

AIG Centennial Ins. Co., 782 F.3d at 1303 (emphasis added).

The result is that "courts in the Eleventh Circuit have employed 'a more fact-specific inquiry' regarding the question of materiality." AIG Centennial Ins. Co. v. O'Neill, 2013 WL 10450139, *14 (S.D. Fla. May 9, 2013). Per Great Lakes Ins., 568 F.Supp.3d at 1325 (emphasis in original, emphasis added):

> The Court will deem material a misrepresentation or omission on an applicant's marine insurance policy 'if it *might* have a bearing on the risk to be assumed by the

31

insurer.' *Id.* (emphasis added; quoting *Fraser*, 211 F.3d at 1363 (quotation marks omitted)). '[A] finding that **even one misrepresented or omitted fact** *might* have affected [the insurer's] decision to insure will void the policy.' *Id.* (alterations added; emphasis in original; citation and quotation marks omitted). Furthermore, the Court's fact-specific materiality analysis requires that the insurer provide specific evidence of materiality unless the materiality of the omitted fact is 'patently obvious[.]' *Roca*, 2009 WL 200252, at *6 (alteration added). The insurer's after-the-fact, conclusory statements claiming a certain fact is material and would have affected its decision to insure an applicant are inadequate grounds for the Court to conclude that an omitted fact is material. *See id.*; *AXA Glob. Risks (UK) Ltd. v. Pierre,...*, 2001 WL 1825853, at *9 (S.D. Fla. Nov. 8, 2001).

Thus, after-the-fact, conclusory statements by an insurer that a certain fact was material and would have affected its decision to insure is not enough. *See, e.g., AXA Global Risks (UK) Ltd. v. Pierre,* 2001 WL 1825853, at *9 (S.D.Fla. Nov. 8, 2001)) (citing *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985)). An insurer must provide some specific evidence capable of showing the omitted fact's materiality, *see AXA Global,* 2001 WL 1825853 at *9, and the Court must consider that evidence under an objective standard—whether a reasonable person in the assured's position would know that the particular fact is material, *American Home Assur. Co. v. Masters' Ships Mgmt. S.A.,* 423 F.Supp.2d 193, 221 (S.D.N.Y.2006) (citing *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir.1986)), *aff'd,* 489 F.3d 497 (2d Cir.2007)).

"Materiality can be decided as a matter of law **only** 'if reasonable minds could not differ on the question.' *O'Neill,* 782 F.3d at 1305 n. 10." Great Lakes Ins., 570 F.Supp.3d at 1266 (emphasis added). See, e.g, AIG Centennial Ins. Co., 782 F.3d at 1303 and 1305 at note 10; Great Lakes Reinsurance (UK) PLC v. Roca, 2009 WL 200252, *4 (S.D. Fla. Jan. 27, 2009) (citing Woods v. Indep. Fire Ins. Co., 749 F.2d 1493, 1496 (11th Cir. 1985)).

The parties dispute whether *uberrimae fidei* applies to the P&I insurance policy for the M/V EAGLE II. Specifically, Yaring's correctly states that parties may contract out of *uberrimae*

*fidei*. Yaring's argues that this is what occurred in this case.  As summarized in <u>Geico Marine Ins.</u>

<u>v. Shackleford</u>, 2017 WL 6264000, *7 (M.D. Fla. Dec. 7, 2017):

> ... parties to a marine insurance contract "are free to 'contract-out' or 'contract around' state or federal law with regard to an insurance contract, so long as there is nothing void as to public policy or statutory law about such a contract." *See King v. Allstate Ins. Co.*, 906 F.2d 1537, 1542 (11th Cir. 1990). When parties "contract for their own standard to show misrepresentation or omission," that language "controls the rights and obligations of the parties," and the doctrine of *uberrimae fidei* is not applicable. *See id.* at 1542-43.

Yaring's argues that the parties contracted out of *uberrimae fidei* rendering it inapplicable

due to three (2) portions of the policy and one (1) endorsement, exclusively.  <u>First</u>, Paragraph 6 of

the Policy "Concealment, Misrepresentation or Fraud" which states: "This insurance Policy shall

be void as to all interests insured if, whether before or after a loss, any insured hereunder has

concealed or misrepresented any material fact or circumstance concerning this insurance or the

subject thereof, or the interests of the insured therein, or in the case of any fraud or false swearing

by any insured hereunder relating thereto." <u>Second</u>, Endorsement IMU 0112 0107, "Coverage

Endorsement to Section I, Part II, Protection & Indemnity Crew Endorsement," arguing that the

parties agreed to remove coverage limitations of the Jones Act, Death on High Seas Act, and

general maritime law from the Protection & Indemnity Insuring Conditions. <u>Third</u>, the policy

language stating "no action under this insurance shall be sustainable unless commenced within the

shortest limitation period permitted under the laws of such State."  (ASOC 001692).

Policy language "does not run counter to *uberrimae fidei*" when "there is no requirement

that any misrepresentation or omission be <u>intentional</u>."  <u>Quintero v. Geico Marine Ins. Co.</u>, 389

F.Supp.3d 1153, 1160 (S.D. Fla. 2019) (emphasis added). There are no provisions in the policy

which require misrepresentations to be "intentional."    Yaring's contention otherwise is without

merit.  See, e.g., Port Lynch v. Samsung Fire & Marine Ins. Co., Ltd., 2013 WL 5771197, *5 (D. Hawai'i Oct. 24, 2013) (applying the doctrine to a virtually identical paragraph in a marine insurance policy).

Moreover, per the Endorsement Yaring's argues that federal maritime law does not apply. Yet, a review of the Endorsement indicates the reverse. The Endorsement deleted the provisions cited by Yaring's *from the policy's exclusions* (*i.e.*, the policy was amended via the Endorsement to provide coverage for maritime claims such as the Jones Act, Death of the High Seas Act, and general maritime law) subject to the policy's terms, conditions, and applicable law.

With regard to Yaring's state law argument -- that the policy does not reference federal admiralty law only the law of "such State" -- and so maritime law is inapplicable, the Court is not persuaded. The case relied upon by Yaring's, *Odyssey Marine Expl., Inc. v. Unidentified, Shipwrecked Vessel or Vessels,* 512 Fed. Appx. 890, 893 (11th Cir. 2013), analyzed a written agreement which provided "the laws of the State of Florida shall govern the agreement[]" (*i.e.*, a choice of law or governing law provision).  The ASIC Policy has no choice or law or governing law provision and so *Odyseey's* appears irrelevant.  And Yaring's has not explained how the referenced portion of the policy could or should be deemed as such. Accordingly, Yaring's is held to the highest degree of good faith in its disclosures to ASIC.

## C.   <u>Concealment of Prior Loss</u>

Initially, Yaring's argues that ASIC has waived its claim of denial based on concealment. The parties agree that through a September 16, 2020 denial of coverage letter, ASIC denied coverage to Yaring's based only on the Passenger Warranty, not stating anything about a "no loss" misrepresentation. (Doc. 75 at 5; Doc. 74-17 (9/16/20 letter)). Yaring's argues that under Alabama

law, once an insurer specifies the grounds for denial of coverage it waives any and all other grounds or defenses (citing First Alabama Bank of Montgomery, N.A. v. First State Ins. Co., 899 F.2d 1045, 1063 (11th Cir.1990) ("Under Alabama law, when an insurer specifically denies liability on one ground, it waives other grounds or defenses it might later seek to assert[]").  (Doc. 88 at 22). From this, Yaring's claims ASIC cannot rely on the "no loss" representation for denial of coverage.   In response, ASIC argues *uberrimae fidei*, stating that Yaring's material misrepresentations provide for voiding the policy (essentially rescission), and then highlights and emphasizes the reservation of rights/non-waiver language contained in its Sept 2020 denial of coverage letter. (Doc. 96 at 8-10).

As explained in American Gen. Life Ins. Co. v. Billups, 2009 WL 10687967 (N.D. Ala. May 11, 2009):

> Under Alabama law, when an insurer "specifically denies liability on one ground, it thereby waives all other grounds of forfeiture." *American Auto. Ins. Co. v. English*, 94 So. 2d 397, 402 (Ala. 1957). While courts are "extremely liberal in their application of the doctrines of waiver and estoppel to obviate forfeiture of a contract of insurance," it is equally the case that "those doctrines cannot be used to extend the coverage of an insurance policy or to create a primary liability." *Kaminer v. Franklin Life Ins. Co.*, 472 F.2d 1073, 1076–77 (5th Cir. 1973) (discussing waiver when insurance company initially cited suicide as a basis for denying coverage rather than decedent's failure to pay the first premium until two days after her death); *Home Indem. Co. v. Reed Equipment Co.*, 381 So. 2d 45, 51 (Ala. 1980) ("Thus, coverage under an insurance policy cannot be created or enlarged by waiver or estoppel ...."). The principle behind this doctrine is an equitable one. Courts are willing to take steps to prevent an insured, who has faithfully paid premiums on a valid insurance policy, from forfeiting the right to recover on that policy. By the same logic, however, when the more fundamental question of coverage is in play, the doctrine of forfeiture should not force an insurance company to pay a claim on a policy that was never valid. *Kaminer*, 472 F.2d at 1077 ("To hold the defendant estopped to assert that it did not contract to insure the life of a deceased person would be a perversion of an equitable doctrine.")….
>
> …. when the issuance of an insurance policy is induced by a fraudulent misrepresentation, it is void *ab initio. See State Farm Mut. Auto. Ins. Co v. Lee,*

343 F.2d 55, 58 (5th Cir. 1965) ("[A] fraudulent representation in the application inducing the execution of a policy of insurance can generally be availed of to avoid the policy, just as any contract can be avoided for fraud ab initio."). As discussed further *infra*, it is appropriate in such an instance for the insurance company to rescind a policy based on fraudulent misrepresentation **if those misrepresentations are material** or if the insurance company would not have issued the policy or would have required a greater premium if it had possessed truthful answers. *See Alfa Life Ins. Corp. v. Lewis*, 910 So. 2d 757, 762 (Ala. 2005). If the policy is rescinded, "the proper remedy is to restore all parties to the status quo ante, and each party should be placed in a position that it would have occupied had the conveyance not been made." *Putman Constr. & Realty Co. v. Byrd*, 632 So. 2d 961, 967 (Ala. 1992); *Lexington Ins. Co. v. Wolfe*, 2008 U.S. Dist. LEXIS 102282, *8–9 (S.D. Ala. Dec. 16, 2008). In other words, recision [sic] "in essence wipes out or erases the policy from the very beginning; it never existed." *In re Healthsouth Corp. Ins. Litig.*, 308 F. Supp. 2d 1253, 1290 (N.D. Ala. 2004).

Because American General's defense goes directly to the existence of a life insurance policy, the doctrine of waiver is inapplicable. American General is seeking to rescind the life insurance policy in question due to material misrepresentations in the application for that policy. If American General is correct in this contention, then the policy itself never existed; it was void *ab initio*. Applying the doctrine of waiver in this instance would prevent American General from relying on the non-existence of the policy, thus effectively creating coverage where none existed. To do so would violate the well settled law in Alabama that waiver and estoppel cannot create or enlarge insurance coverage. *Kaminer*, 472 F.2d at 1076–77; *Home Indem. Co.*, 381 So. 2d at 51. American General .... argues that if Davis had provided the correct information before the policy even came into existence, it never would have been issued. Therefore, the doctrine of waiver does not apply, and American General is not estopped from arguing that Davis's policy was void due to material misrepresentations regarding his medical history.

Id. at *5-6 (emphasis added). Moreover, as summarized in <u>AIG Centennial Ins. Co. v. O'Neill</u>,

2013 WL 10450139, *22 (S.D. Fla. May 9, 2013) (emphasis added):

... **The doctrines of waiver and estoppel do not apply in the context of *uberrimae fidei* in marine insurance contracts**. *HIH Marine Services*, 211 F.3d at 1362. The Eleventh Circuit has explained, *"'uberrimae fidei* does not permit the use of the principles of waiver and estoppel to provide coverage where there has been a material misrepresentation on the application.'" *Id.* at 1362 n. 2 (*citing Giroire*, 27 F.Supp.2d at 1310). *See also Great Lakes Reinsurance PLC v. Barrios*, 2008 WL 6032919, at *5 (S.D.Fla. Dec.10, 2008) (stating that "Defendants' arguments regarding waiver and estoppel can be properly ignored by the Court" for the same reason).

Accordingly, ASIC has not waived the defense of material misrepresentation by failing to assert it in the initial denial.

ASIC asserts they are entitled to summary judgment because Yaring's concealed the loss through their agents' statements and by failing to disclose the May 23, 2020 incident on the application. ASIC's evidence that Yaring's agents communicated to ASIC/Intact that there was no loss is lacking. See *supra*. However, there is no dispute that Yaring's did not disclose the May 23, 2020 incident on its application. Yaring's did not complete the Loss Record portion of its policy application as, from its perspective, there had been no "loss" because "loss" is not defined in the application. The Loss Record section states "whether insurance is in force or not, list all losses incurred during the past five years arising from operations covered by this form of policy, including date, cause, amount paid or estimated amount, if claims not settled. If none, state 'none.'" If state law was applicable, the Court would likely find that inquiry about "losses incurred" was ambiguous. However, ambiguity is not a defense to failure to disclose a material fact in an application for marine insurance. AIG Centennial Ins. Co, 782 F.3d at 1304 ("[b]ut even assuming the term is ambiguous, it matters not. The federal maritime doctrine of *uberrimae fidei*—not state contract law—governs this dispute, and it provides no refuge in claiming ambiguity[]")

However, there are still two disputes that remain.[5] First, Yaring's disputes that ASIC was unaware of the May 23, 2020 incident. Next, Yaring's disputes that the omission on the application

---

5 In response to ASIC claim of misrepresentation/concealment, Yaring's also argues that after ASIC became aware of the alleged misrepresentations, it cancelled coverage for the vessel effective October 20, 2020, making the claims that occurred on May 23, 2020 covered claims. The Court finds no merit to this argument because if there was a material misrepresentation, the policy is *void ab initio*.

Yaring's also argues that ASIC cannot void the policy only as to the M/V EAGLE II; "a misrepresentation of an application is grounds for voiding the Policy." However, the case authority cited by Yaring's does not support this assertion and the Court will not do further research to determine the validity of this claim.

was material.  Yaring's has supported each of these arguments with sufficient evidence to avoid summary judgment.

**D.**    **Violation of Passenger Warranty**

Per ASIC, the only information received for a passenger limit for the M/V EAGLE II was the April 2020 spreadsheet submitted by Laurie Jones, listing 12 passengers. Based on that representation, ASIC's underwriters assessed the risk and set the premium and an updated insurance quote was prepared to reflect the P&I insurance for all vessels, including the M/V EAGLE II. Per ASIC:

> ASIC did not arbitrarily determine that the Passenger Warranty would limit the EAGLE II to 12 passengers. This information is and was the only information regarding the number of passengers for the EAGLE II prior to the accident provided; not 16 and not 23. ASIC issued its P&I coverage for the EAGLE II based on this representation and subject to the Passenger Warranty...
>
> \*\*\*
>
> In setting premiums for vessels in its marine insurance policies, ASIC considers the number of passengers permitted aboard a vessel. ... The number of passengers on board a vessel directly effects the amount of risk association with that vessel. Id. This is evident in the insurance summary quotes provided by Yaring's agent to Yaring's for review and consideration. During the underwriting process for this Policy, Yaring's requested quotes showing the differences in the vessels running "per usual" (i.e., with passengers aboard) versus a "port risk" option, where the vessels would not have passengers on board. The ... quote ... shows the "port risk" option, which does not provide coverage for passengers, and the EAGLE II premium at $3,300.00[]...
>
> \*\*\*
>
> A second quote .... for the vessels in operation, specifically the EAGLE II operating with a limit of 12 passengers, reflects an increased premium at $3,420.00 to account for the associated risk of 12 passengers on board.
>
> \*\*\*
>
> If Yaring's or Yaring's agent had instead provided that the EAGLE II operated with up to 16 passengers or to 23 passengers, the associated risk and premium would have increased accordingly.

(Doc. 75 at 21, 23-24).

Yaring's asserts that it intended a 23 passenger limit for the M/V EAGLE II but mistakenly wrote 12 passengers in its passenger schedule submitted during the policy application process. Yaring's argues that the mistake was unintentional and was not material.  As to materiality, Yaring's argues that "the difference in premium between 12 passengers 16 is $40 and $110 for 23 passengers. This premium increase out of a total premium of $43,325 is clearly not material." (Doc. 88 at 21, 27-28).

As to materiality, ASIC also argues that the passenger warranty must be strictly complied with regardless of materiality.  However, Eleventh Circuit law clearly contradicts this assertion. Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC, 996 F.3d 1161, 1169 (11th Cir. 2021) (declining to apply the maritime rule that express warranties in maritime insurance contracts *must* be strictly construed in the absence of some limiting provision in the contract, because there is no entrenched federal maritime rules governing captain or crew warranties). ASIC appears to assert that because the Traveler's case had not been decided in the fall of 2020 when the claim was denied, that this Court should ignore the holding in Travelers.  Such contention is without merit.

As to materiality, the undersigned concludes that reasonable minds could differ on whether the discrepancy in the number of passengers was material.  Thus, the motion for summary judgment of to the propriety of denying coverage based on a violation of the passenger warranty is **DENIED**.[6]

---

6 ASIC also argues that Yaring's violated the Policy's legal warranty that states "the vessel be operated by a captain duly licensed in accordance with United States law and the law of the port of registry." The alleged violative action was that the USCG Certificate of Documentation states recreational instead of commercial.  The Court finds no merit to ASIC's argument as the COD does not change the fact that there is no evidence that the captain was not properly licensed.

V.    **Bad Faith**

In the Third-Party Complaint Yaring's alleges that ASIC committed bad faith under Alabama law by denying coverage without a debatable reason, and as a proximate result, Yaring's was damaged.  (Doc. 14 at 4).  On summary judgment ASIC contends that it had reasonably legitimate and/or arguable reasons to deny coverage to Yaring's and void its policy in relation to the M/V EAGLE II.

As explained in Nat'l Sav. Life Ins. Co. v. Dutton, 419 So. 2d 1357, 1362 (Ala. 1982), "in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail."   Whereas, the Court has determined that genuine issues of material fact remain as to whether coverage was properly denied based on the passenger warranty and/or failure to disclose the May 23, 2020 incident, the bad faith claim fails. Accordingly, summary judgment is **GRANTED** as to Yaring's bad faith claim.

VI.    **Conclusion**

Accordingly, it is **ORDERED** that ASIC's motion for summary judgment is **DENIED** as to Yaring's claim of Breach of Contract and **GRANTED** as to Yaring's claim of Bad Faith.

**DONE** and **ORDERED** this the **1st** day of **December 2022.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**